BRETT A. SHUMATE
Assistant Attorney General, Civil Division
BILAL A. ESSAYLI
First Assistant United States Attorney
DAVID M. HARRIS, AUSA
Chief, Civil Division
HUNTER B. THOMSON
Acting Chief, Civil Fraud Section
PAUL B. LA SCALA (CA Bar #186939)
Assistant United States Attorney
     Room 7516, Federal Building
     300 North Los Angeles Street
     Los Angeles, California 90012
     Tel: (213) 894-2467; Fax: (213) 894-7819
     E-mail: Paul.LaScala@usdoj.gov
JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
JARED S. WIESNER
PADEN GALLAGHER
Attorneys, Civil Division
United States Department of Justice
     P.O. Box 261, Ben Franklin Station
     Washington, D.C. 20044
     Tel: (202) 353-1274
     Fax: (202) 616-3085
     Email: Jared.S.Wiesner2@usdoj.gov
Attorneys for the United States of America

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* BRYAN QUESENBERRY,<br><br>        Plaintiff,<br><br>        v.<br><br>JMG INVESTMENTS, INC., and JEFFREY SCHWARTZ<br><br>        Defendants. | No. 2:20−cv−08497−MWF−AS<br><br>**UNITED STATES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Fed. R. Civ. P. 56]**<br><br>[Separate Statement of Uncontroverted Facts, Declarations, and [Proposed)] Judgment filed concurrently herewith]<br><br>Hearing Date:   December 15, 2025<br>Hearing Time:   10:00 a.m.<br>Ctrm:          5A |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, on December 15, 2025 at 10:00 AM, as soon thereafter as it may be heard, Plaintiff United States of America ("United States") will, and hereby does, move this Court for an order recommending granting summary judgment in its favor.  This motion will be made before the Honorable Michael W. Fitzgerald, United States District Judge, Courtroom 5A, 5th Floor, located at 350 W 1st St, Los Angeles, CA 90012.

The United States brings this motion on the grounds that Defendants JMG Investments, Inc. ("JMG") and Jeffrey Schwartz cannot raise a genuine triable issue of material fact or otherwise prevail on the United States' claims against them, and the United States is therefore entitled to summary judgment under Fed. R. Civ. P. 56(a).

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the Separate Statement of Uncontroverted Facts ("SUF"), and supporting declarations, filed concurrently herewith, all pleadings, records, and other documents on file with the Court in this action.

Pursuant to Local Rule 7-3, on November 6, 2025, Trial Attorneys Paden Gallagher and Jared Wiesner met-and-conferred with Defendants' counsel, Richard A. Rodgers, and discussed the substance of the United States' contemplated Motion for Summary Judgment.  The parties were unable to reach a resolution which would eliminate the necessity for a hearing.

Dated: November 17, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division
BILAL A. ESSAYLI
First Assistant United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
HUNTER B. THOMSON
Acting Chief, Civil Fraud Section
PAUL B. LA SCALA
Assistant United States Attorney

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
JARED S. WIESNER
PADEN GALLAGHER
Attorneys, Civil Division

*/s/ Paden Gallagher*
PADEN GALLAGHER
Trial Attorney

*Attorneys for the United States of America*

# **TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................1

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ....................1

   A.    STATUTORY AND LEGAL FRAMEWORK .........................................................1

     1.    *The Paycheck Protection Program*.........................................................1

     2.    *SBA's Section 7(a) Loan Program*........................................................2

     3.    *PPP Loan Forgiveness* ..........................................................................3

   B.    DEFENDANTS' PAYCHECK PROTECTION PROGRAM LOANS .......................3

     1.    *Defendants' Loan Applications* .............................................................3

     2.    *Defendants' PPP Loan Forgiveness Applications* ...............................6

   C.    RELEVANT PROCEDURAL BACKGROUND .......................................................7

III.  LEGAL STANDARD .........................................................................................7

IV.   ARGUMENT.......................................................................................................8

   A.    IT IS UNDISPUTED THAT SUMMARY JUDGMENT IS WARRANTED ON THE UNITED STATES' COMMON LAW CLAIMS (COUNTS IV & V). ...............................8

     1.    *Summary Judgment is Warranted on the United States Payment by Mistake Claim (Count V).*...................................................................8

     2.    *Summary Judgment is Warranted on the United States' Unjust Enrichment Claim (Count IV)*.............................................................9

   B.    SUMMARY JUDGMENT IS WARRANTED ON THE UNITED STATES' FCA CLAIMS BASED ON DEFENDANTS' FALSE STATEMENTS AND FRAUDULENT COURSE OF CONDUCT IN APPLYING FOR AND RECEIVING TWO PPP LOANS (COUNTS I & II). .........................10

     1.    *Defendants Made False Statements in the Fountainhead Application and Engaged in a Fraudulent Course of Conduct to Improperly Receive Two PPP Loans in 2020.*......................................................11

     2.    *Defendants' Acted with Reckless Disregard of the Falsity of their Statements*

*at Minimum.* ...................................................................................... *13*

    3.    *Defendants' False Statements Were Material to the Decision to Issue the*

*Fountainhead Loan.* ............................................................................ *15*

    4.    *The Fountainhead Loan Application Constitutes a "Claim."* .......... *16*

C.    Summary Judgment is Warranted on the United States' Reverse False

Claim (Count III). ............................................................................... 18

D.    Calculation of Damages Under the False Claims Act .............................. 19

**V.    CONCLUSION** ...................................................................................... **20**

1

## <u>TABLE OF AUTHORITIES</u>

2

3
**Cases**

4
*Carter v. Bridgepoint Educ., Inc.*,
5
   No. 10-cv-1401-JLS-WVG, 2014 WL 11906590 (S.D. Cal. Jan. 8, 2014) ............... 11

6
*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 8
7

8
*Cook Cnty. v. United States ex rel. Chandler*,
   538 U.S. 119 (2003) ...................................................................................... 20
9

10
*Friedman v. Live Nation Merch., Inc.*,
   833 F.3d 1180 (9th Cir. 2016) ........................................................................ 8

11
*Hawai'i Disability Rights Ctr. v. Kishimoto*,
12
   122 F.4th 353 (9th Cir. 2024) ......................................................................... 8

13
*In re Gateway Radiology Consultants, P.A.*,
   983 F.3d 1239 (11th Cir. 2020) ...................................................................... 2
14

15
*Tolan v. Cotton*,
   572 U.S. 650 (2014) ........................................................................................ 8
16

17
*United States ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) .......................................................... 11, 12, 16

18
*United States ex rel. Godecke v. Kinetic Concepts, Inc.*,
19
   937 F.3d 1201 (9th Cir. 2019) ...................................................................... 15

20
*United States ex rel. Hendow v. Univ. of Phoenix*,
21
   461 F.3d 1166 (9th Cir. 2006)............................................................. 14, 16, 17

22
*United States ex rel. Kane v. Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015) ........................................................ 18
23

24
*United States ex rel. Landis v. Tailwind Sports Corp.*,
   234 F. Supp. 3d 180 (D.D.C. 2017) ............................................................ 10

25
*United States ex rel. Mei Ling v. Los Angeles*,
26
   389 F. Supp. 3d 744 (C.D. Cal. 2019) ........................................................ 16

27
*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017) .................................................................... 14
28

*United States ex rel. Silingo v. WellPoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018) ...................................................................... 18

*United States v. Honolulu Comm. Action Prog., Inc.*,
   No. 16-cv-00062-JMS-KJM, 2019 WL 4739283 (D. Haw. Sept. 27, 2019) ............ 11

*United States ex rel. Duntsch v. Superior Care Pharmacy*,
   No. 18-cv-1002-MMA-MSB, 2025 WL 108188 (S.D. Cal. Jan. 15, 2025) ........... 8, 9

*United States v. Bellecci*,
   No. 05-cv-1538-LKK-GGH, 2008 WL 802367 (E.D. Cal. Mar. 26, 2008) ............... 9

*United States v. Bourseau*,
   531 F.3d 1159 (9th Cir. 2008) ......................................................... 14, 15, 19

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ...................................................................... 15

*United States v. Mackby*,
   339 F.3d 1013 (9th Cir. 2003) .................................................................... 19

*United States v. Mead*,
   426 F.2d 118 (9th Cir. 1970) ........................................................................ 9

*United States v. Systron-Donner Corp.*,
   486 F.2d 249 (9th Cir. 1973) ........................................................................ 8

*United States v. Woodbury*,
   359 F.2d 370 (9th Cir. 1966) ...................................................................... 19

*Univ. Health Servs. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016) ....................................................... 11, 12, 15, 16

*Urquilla-Diaz v. Kaplan Univ.*,
   780 F.3d 1039 (11th Cir. 2015) .................................................................. 14

**Statutes**

15 U.S.C. § 634 .......................................................................................... 3

15 U.S.C. § 636 .................................................................................. 1, 2, 17

15 U.S.C. § 636m ...................................................................................... 3

31 U.S.C. § 3729 ............................................................................... passim

**Regulations**

13 C.F.R. § 120.2 ....................................................................................... 2

1

28 C.F.R. § 85.5 .................................................................................. 20

2

**Other**

3

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020)................................ 1, 2

4

85 Fed. Reg. 20811 ........................................................................ passim

5

85 Fed. Reg. 23450 .............................................................................. 17

6

86 Fed. Reg. 8283 ................................................................................. 3

7

Fed. R. Civ. P. 56 ........................................................................... 1, 2, 7-8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Plaintiff, the United States of America, submits this motion for summary judgment as to false claims and records related to Defendants' application for a duplicate Paycheck Protection Program ("PPP") loan.  The undisputed evidence shows that Defendants violated the False Claims Act ("FCA") and were unjustly enriched by seeking and receiving two PPP loans in 2020 despite certifying compliance with a prohibition on receiving more than one PPP loan that year.  Moreover, Defendants still have not paid back the ill-gotten loan funds despite being aware of and acknowledging an obligation to return the funds.  Because there is no genuine dispute of material fact on any of the United States' claims, the United States seeks summary judgment as to all of its claims.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Statutory and Legal Framework

#### 1.    The Paycheck Protection Program

In March 2020, Congress passed the CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), to provide emergency assistance to individuals, families, businesses, and health-care providers coping with the COVID-19 pandemic.  *See* 85 Fed. Reg. 20811, 20811-12 (April 15, 2020).  One of the Act's measures was the PPP, tasking the Small Business Administration ("SBA") with implementing a loan program to provide emergency financial assistance to small businesses experiencing economic hardship due to the pandemic.  CARES Act § 1102.  Section 1102(a)(2) temporarily expanded SBA's business-loan authority by adding a new paragraph to SBA's longstanding general purpose loan framework, § 7(a).  15 U.S.C. § 636(a)(36).  As § 636(a)(36)(B) states, "[e]xcept as otherwise provided in [Section 636(a)(36)], the [SBA] may guarantee [PPP] loans," issued by private lenders, "under the same terms, conditions, and processes as [other] loan[s] made under" § 7(a).  The CARES Act provided for forgiveness of up to the full principal amount of SBA guaranteed PPP loans.  CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281 (2020).

1

Congress provided that the PPP's "maximum loan amount" was a borrower's average monthly payroll expenses to employees for the 1-year period before the date of the loan multiplied by 2.5. 15 U.S.C. § 636(a)(36)(E). Congress also directed that SBA allow additional non-§ 7(a) lenders to participate in the PPP and mandated that SBA give all PPP lenders "delegated authority" to make and approve PPP loans without prior SBA review. 15 U.S.C. § 636(a)(36)(F)(ii)(I), (iii).

SBA launched the PPP on April 3, 2020. (SUF ¶ 1.) SBA also established a PPP loan-origination process based on borrower self-certifications of eligibility. *See* 85 Fed. Reg. 20811, 20812, 20814–16 (April 15, 2020). Because borrowers' applications and supporting documentation were maintained by lenders and not sent to SBA, SBA did not make independent determinations regarding borrower eligibility or compliance with program rules at the loan-origination stage. *See id.* at 20814. To help ensure that as many eligible borrowers as possible could obtain PPP loans, an Interim Final Rule issued by SBA allowed borrowers to receive only one PPP loan during 2020. *See id.* 20813-14. In accordance with this rule, all borrowers were required to certify on their loan applications that "[d]uring the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under this program." *Id.*

## 2. SBA's Section 7(a) Loan Program

Section 7(a) of the Small Business Act "empower[s]" SBA to guarantee general purpose loans to small businesses. 15 U.S.C. § 636(a). Typically, SBA guarantees loans by private lenders rather than disbursing funds directly. *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1248 (11th Cir. 2020). Under § 7(a) loan regulations, SBA guaranteed loans are funded and serviced by lenders, but if a borrower defaults, "SBA's guarantee requires SBA to purchase its portion of the outstanding balance." 13 C.F.R. § 120.2(a)(iii). The Small Business Act also broadly authorizes SBA to "make such rules and regulations" as the agency "deems necessary" to implement the loan program, and to "take any and all actions" the agency "determines . . . are necessary or

2

1  desirable in making, servicing, compromising, modifying, liquidating, or otherwise
2  dealing with or realizing on loans[.]" 15 U.S.C. § 634(b)(6–7).

3              3.    PPP Loan Forgiveness

4      The CARES Act provided that "[a]n eligible recipient [of a PPP loan] shall be
5  eligible for forgiveness . . . in an amount equal to the sum of" its covered payroll costs
6  and other allowable expenses, 15 U.S.C. § 636m(b), not to exceed the principal amount
7  of the loan. 15 U.S.C. § 636m(d)(1). Typically, an eligible borrower was required to
8  submit an application and supporting documentation to its lender, which would
9  determine if the borrower would be entitled to forgiveness under the Act, and, if so,
10  submit a request for payment to SBA. 15 U.S.C. § 636m(g); *see also* 86 Fed. Reg. 8283,
11  8287–88 (Feb. 5, 2021). SBA would then remit the appropriate amount to the lender,
12  subject to any SBA review of the loan. 15 U.S.C. § 636m(c)(3); 86 Fed. Reg. at 8288.

13      If a PPP loan is not forgiven and the loan payment becomes more than 60 days
14  past due, SBA instructs lenders to "request a guaranty purchase, which is SBA's
15  purchase of the guaranteed portion of the loan." U.S. SMALL BUS. ADMIN., OFF. OF
16  INSPECTOR GEN., SBA'S GUARANTY PURCHASES FOR PAYCHECK
17  PROTECTION PROGRAM LOANS 3 (July 9, 2024)
18  https://www.sba.gov/sites/default/files/2024-07/SBA%20OIG%20Report%2024-20.pdf
19  (last visited Nov. 14, 2025). SBA then "simultaneously purchases and charges off
20  delinquent loans," meaning that "SBA removes the outstanding balance of the loan from
21  its accounting records." *Id.* Charged-off loans are then referred to the Department of the
22  Treasury for debt collection. *Id.* at 9.

23      **B.    Defendants' Paycheck Protection Program Loans**

24      Defendants are JMG Investments, Inc. ("JMG"), and its sole owner, Jeffrey
25  Schwartz. Defendants received two PPP loans in 2020 in violation of the prohibition on
26  receiving multiple PPP loans in 2020. (SUF ¶ 6.)

27              1.    Defendants' Loan Applications

28      Defendants first submitted a PPP loan application to lender Bank of America on

                                          3

April 8, 2020, for $505,987, which was assigned loan number #4670757309 ("Bank of America Loan"). (SUF ¶¶ 8-9, 33.) While that application was pending, Defendants prepared another loan application to lender Fountainhead SBF LLC ("Fountainhead"), which was submitted on May 7, 2020, for $501,588 and assigned loan number #3948257400 ("Fountainhead Loan"). (SUF ¶¶ 13-14.) Each loan application required Schwartz to affirm the following certification on behalf of JMG: "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (SUF ¶¶ 11-16.) While the Bank of America Loan application contained an accurate Business Taxpayer Identification Number ("TIN") for JMG, the Fountainhead Loan application contained an inaccurate TIN. (SUF ¶¶ 19-21.)

On May 8, 2020, just one day after submitting the Fountainhead Loan application, Schwartz received an email from a representative at Fountainhead's broker which read: "You have a loan number with us and Fountainhead- congrats! You will receive a request for follow up documents within a few days, but you have reserved your 'slice of the pie.'" (SUF ¶ 24.) Schwartz believed that this email meant that "[his] loan had gone through" with Fountainhead. (SUF ¶ 25.) A few days later, on May 12, 2020, Schwartz received a second email from a Fountainhead representative which read: "Congratulations! Your PPP loan has been approved with the SBA." (SUF ¶ 27.) The email further requested information to "prepare everything for closing" on the loan, which Schwartz submitted on May 14, 2020. (SUF ¶¶ 27-29.) Despite receiving these notifications and providing the closing information to Fountainhead, Defendants never withdrew their application for the Bank of America Loan. (SUF ¶¶ 28-31.)

Instead, on May 15, 2020, one day after providing the requested information to Fountainhead, Schwartz signed a promissory note with Bank of America to receive the Bank of America Loan, and Defendants received the $505,987 loan proceeds that same day. (SUF ¶¶ 32-33.) Schwartz then moved the Bank of America funds between his bank accounts on May 19, 2020, and used funds from the loan on May 21, 2020, to pay

4

JMG's payroll. (SUF ¶¶ 36-37.) Defendants never withdrew their application from Fountainhead or informed SBA or Fountainhead that they had already received one PPP loan and, therefore, were ineligible to receive a PPP loan from Fountainhead. (SUF ¶¶ 35, 38.)

On May 22, 2020, ***one day after spending funds from the Bank of America Loan***, Schwartz signed and submitted several documents to Fountainhead to secure the Fountainhead Loan. (SUF ¶ 39.) Among those documents was a promissory note, a "Borrower Certification and Agreement," which was meant "to induce Fountainhead to provide [Schwartz] with a PPP loan," and a "U.S. Small Business Settlement Sheet," which required Schwartz to certify the following: "There has been no unremedied adverse change in the Borrower's or Operating Company's financial condition, organization, management, operations or assets since the date of the application that would warrant withholding or not making this disbursement or any further disbursement." (SUF ¶¶ 40-45.) Schwartz understood from signing these documents "that if Fountainhead charged off that loan, [he] would then have an obligation to repay those loan funds to the government." (SUF ¶ 70.) Defendants received the $501,588 from that loan later that day, and SBA paid Fountainhead a processing fee of 3% of the loan, or $15,047. (SUF ¶¶ 46-47.)

Just over two weeks after receiving the Fountainhead Loan, Schwartz emailed Lori Grieder, the person who connected him with Fountainhead, about the loan. Even though he had signed several closing documents with Fountainhead after receiving the Bank of America Loan, Schwartz claimed in that email that he was "extremely surprised when the money [from the Fountainhead Loan] was deposited into [his] Chase account" and requested "an email or letter from [Ms. Grieder] stating that if, in fact, [he] [is] forced to pay that loan back to the SBA (Chase), [Ms. Grieder] w[ould] reimburse [him] for the $10,032 that [he was] paying [her]" for connecting him to Fountainhead. (SUF ¶¶ 50-51.) When asked under oath what he meant by the email, Schwartz admitted: "Well I knew – I knew that I was – I was only supposed to get one PPP loan, and then all

5

of a sudden the loan from Fountainhead came through.  I wasn't expecting it because I had already received the loan from Bank of America." (SUF ¶ 52.)  Ms. Grieder testified that during a phone conversation following that email, Schwartz informed Ms. Grieder that he was "going to put the money aside" from the Fountainhead Loan in case "[he] happen[s] to have to pay" it back.  (SUF ¶ 53.)

### 2.    Defendants' PPP Loan Forgiveness Applications

Defendants applied for forgiveness on both PPP loans despite only being eligible to receive one PPP loan in 2020.  Defendants applied for forgiveness on the Bank of America Loan on November 30, 2020, and were granted forgiveness on the loan in February 2021.  (SUF ¶¶ 56-58.)  Schwartz was aware that the loan had been forgiven. (SUF ¶ 59.)

Despite Schwartz's earlier statement that he would "put the money aside" from the Fountainhead loan in anticipation of having to repay it, Defendants nonetheless applied for forgiveness on the Fountainhead Loan at some point before July 2021.  (SUF ¶ 61.) After that application was denied, Defendants applied for forgiveness a second time on July 19, 2021.  (SUF ¶ 60.)  Fountainhead also denied this application, and, in April 2022, Fountainhead informed Schwartz "that they can only accept one PPP per year from any account so they are rejecting the forgiveness on that loan but will give [him] 5 years to pay it back."  (SUF ¶ 62.)  Despite this, Defendants did not pay back the loan to Fountainhead, and Schwartz, instead, contemplated "try[ing] to get them to forgive it this year 2022" since Defendants did "not have one th[at] year."  (SUF ¶¶ 63-64.)

Schwartz again applied for forgiveness with Fountainhead.  (*See* SUF ¶ 65 (noting that JMG's loan forgiveness application was once again "pending" in July 2022).)  On July 5, 2022, a representative of Fountainhead emailed Ms. Grieder, who forwarded the message on to Schwartz, that JMG's account "shows 2-1st draw and 1-2nd draw" loans with "a 1st draw and a 2nd draw that both show "Paid in Full," but that SBA only "allows for 1-1st draw and 1-2nd draw."  (SUF ¶ 65.)  That application was similarly denied, and SBA purchased the Fountainhead Loan from Fountainhead for $501,588 in July 2022

1    pursuant to SBA's guaranty.  (SUF ¶¶ 66-67.)[1]  Despite admitting that they "do not

2    assert any right to retain the proceeds of the [Fountainhead Loan]," Defendants never

3    repaid any of the funds from the loan.  (SUF ¶¶ 71-72.)

4         **C.    Relevant Procedural Background**

5         Relator filed this *qui tam* action on September 10, 2020, against Schwartz, JMG,

6    and several other now-dismissed Defendants who allegedly received improper PPP

7    loans.  (*See* Dkt. 1.)  On May 30, 2024, the United States filed a notice of its election to

8    intervene as to the claims against JMG and Schwartz.  (*See* Dkt. 38.)  The United States

9    filed its Complaint in Intervention on August 28, 2024.  (*See* Dkt. 41.)

10         The United States asserts five counts in its Complaint.  The first three counts arise

11   under the False Claims Act:  first, the presentation of a false claim for payment under 31

12   U.S.C. § 3729(a)(1)(A) (Count I); second, the submission of false records material to a

13   false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B) (Count II); and third, a reverse

14   false claim under 31 U.S.C. § 3729(a)(1)(G) (Count III).  (*See* Dkt. 41 ¶¶ 42-56).  The

15   final two counts for unjust enrichment (Count IV) and payment by mistake (Count V)

16   arise under federal common law.  (*See* Dkt. 41 ¶¶ 57-67.)

17   **III.   LEGAL STANDARD**

18         Summary judgment is proper when the pleadings, the discovery and disclosure

19   materials, and any affidavits or declarations show that there is no genuine dispute of any

20   material fact and that the moving party is entitled to judgment as a matter of law.  Fed.

21   R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  "There is a

22   genuine issue of material fact when a reasonable jury reviewing the evidence submitted

---

[1] In November 2022, Fountainhead submitted Defendants' July 19, 2021 forgiveness application to SBA despite SBA having purchased the guaranty.  (SUF ¶ 67.).  Because SBA utilizes a "two-step process involving automated screening of all loans at the outset, followed by manual forgiveness review of select loans afterward" to determine if a loan is eligible for forgiveness, and because the Fountainhead Loan "underwent the automated review stage and was not chosen for manual forgiveness review," SBA ultimately reclassified the Fountainhead Loan from guaranteed purchased to forgiven.  (SUF ¶ 68.)  However, "[i]f SBA had known that JMG had already received the Bank of America Loan, it would not have forgiven the Fountainhead Loan."  (SUF ¶ 69.)

on summary judgment could return a verdict for the nonmoving party." *Hawaiʻi Disability Rights Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024).  The moving party has "the ultimate burden of persuasion on a motion for summary judgment." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).  In considering a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party."  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

## IV.    ARGUMENT

### A.    It is Undisputed that Summary Judgment is Warranted on the United States' Common Law Claims (Counts IV & V).

The United States' common law claims of unjust enrichment and payment by mistake are "alternative theories of relief, which the government may bring alongside its FCA claims," and exist "independent of statute."  *United States ex rel. Duntsch v. Superior Care Pharmacy*, No. 18-cv-1002-MMA-MSB, 2025 WL 108188, at *3 (S.D. Cal. Jan. 15, 2025); *see also United States v. Systron-Donner Corp.*, 486 F.2d 249, 251 (9th Cir. 1973) ("[T]he common-law remedy of payment by mistake is available to the United States independent of its statutory remedies.").  Because there is no genuine dispute as to any fact material to these claims, and because Defendants have already ***admitted*** that they should not have received the Fountainhead Loan by making clear that they "do not assert any right to retain the proceeds of the [Fountainhead Loan]," summary judgment is warranted.  (SUF ¶ 72; Dkt. 57 at 6.)

### 1.    Summary Judgment is Warranted on the United States Payment by Mistake Claim (Count V).

The theory of payment by mistake is "both a theory of recovery and remedy uniquely 'available to the United States and [] independent of statute,'" meant to allow the United States to "recover payments made under an erroneous belief that was material to the decision to pay, even if the payments were innocently received."  *United States v.*

1   *Bellecci*, No. 05-cv-1538-LKK-GGH, 2008 WL 802367, at *4 (E.D. Cal. Mar. 26,

2   2008), *rep. and rec. adopted*, No. 05-cv-1538-LKK-GGH, 2008 WL 2420752 (E.D. Cal.

3   June 13, 2008) (quoting *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970)).  To

4   prove it is "entitled to recover" mistakenly paid funds under this theory, the United

5   States must show that it "made the[] payments under an erroneous belief which was

6   material to the decision to pay" the funds.  *Duntsch*, 2025 WL 108188, at *3 (quoting

7   *Mead*, 426 F.2d at 124).  A defendant's "[k]nowledge of falsity is not a requisite for

8   recovery under the mistake doctrine."  *Mead*, 426 F.2d at 125 n.6.

9            There is no dispute that the United States guaranteed, and Fountainhead disbursed,

10  the Fountainhead Loan under the mistaken belief that JMG would only receive one PPP

11  loan in 2020 and, thus, was eligible to receive the Fountainhead Loan.  Borrowers were

12  required to certify that they would only receive one PPP loan in 2020 to receive a PPP

13  loan.  *See* 85 Fed. Reg. 20811, 20813-14 (April 15, 2020).  Defendants did so in their

14  application, and Fountainhead relied on that certification in disbursing the fully

15  guaranteed Fountainhead Loan.  (SUF ¶¶ 4-5, 16.)  Indeed, "[i]f SBA had known that

16  JMG had already received the Bank of America Loan, it would not have forgiven the

17  Fountainhead Loan."  (SUF ¶ 69.)  Thus, the loan was made under the mistaken belief

18  that Defendants would only receive one PPP loan in 2020, and there is no genuine

19  dispute that JMG was paid by mistake.

20                    2.      Summary Judgment is Warranted on the United States' Unjust
                              Enrichment Claim (Count IV).
21

22           The common law remedy of unjust enrichment is similarly available to the United

23  States outside of its statutory remedies.  *See Duntsch*, 2025 WL 108188, at *3; *see also*

24  *Bellecci*, 2008 WL 802367, at *6 (noting that "federal common law supports

25  reimbursement of federal monies improperly paid pursuant to federal programs" under a

26  theory of unjust enrichment).  To prove unjust enrichment, a plaintiff must show: "(1)

27  the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit;

28  and (3) under the circumstances, the defendant's retention of the benefit is unjust."

                                                     9

*United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 205 & n.15 (D.D.C. 2017) (quoting *In re APA Assessment Fee Litig. v. APA*, 766 F.3d 39, 45–46 (D.C. Cir. 2014)).

As to the first two elements, there is no dispute that the United States conferred a benefit on Defendants of $501,588 through the fully guaranteed Fountainhead Loan and that Defendants retained the benefit of that loan since they utilized the loan funds and have not paid them back. (*See* SUF ¶¶ 46, 71.) Nor can there be any genuine dispute that Defendants' retention of that benefit would be unjust. Businesses were only permitted to receive one PPP loan in 2020 to ensure that enough funds were available to assist as many borrowers as possible. *See* 85 Fed. Reg. 20811, 20813 (April 15, 2020). This meant that borrowers that were struggling but still followed the rules governing the PPP were restricted to a single PPP loan, while Defendants were given nearly twice the money that they were entitled to receive by not following the same rules. Allowing Defendants to retain the benefit of their second PPP loan when no other borrower was entitled to receive more than one PPP loan in 2020 would be plainly unjust, especially when Defendants agree that they do not have "any right to retain the proceeds of" the loan in the first place. (SUF ¶ 72.)

## B. Summary Judgment is Warranted on the United States' FCA Claims Based on Defendants' False Statements and Fraudulent Course of Conduct in Applying for and Receiving Two PPP Loans (Counts I & II).

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" and who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). While section 3729(a)(1)(A) creates liability for one who presents or causes another to present a false claim to the government for payment or approval, section 3729(a)(1)(B) prevents "those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States v. Honolulu*

10

*Comm. Action Prog., Inc.*, No. 16-cv-00062-JMS-KJM, 2019 WL 4739283, at *7 (D. Haw. Sept. 27, 2019) (quoting *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004) (Roberts, J.)) (emphasis in original).  Thus, section 3729(a)(1)(B) is "complementary" to section 3729(a)(1)(A), and the elements for each count "are practically identical."  *Id.* at *7 (quoting *Pencheng Si v. Laogai Rsrch. Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (Jackson, J.)).  To prove a violation under these theories, the United States must show "(1) a false statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (citation omitted).

Because there is no genuine dispute of material fact as to any of those elements, the United States is entitled to summary judgment on its 31 U.S.C. § 3729(a)(1)(A) and 3729(a)(1)(B) claims.

  1. <u>Defendants Made False Statements in the Fountainhead Application and Engaged in a Fraudulent Course of Conduct to Improperly Receive Two PPP Loans in 2020.</u>

Because "Congress did not define what makes a claim 'false' or 'fraudulent'" in the FCA, courts apply the "well-settled meaning of the common-law terms," which includes "claims containing express falsehoods."  *Univ. Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (citation omitted).  But "'[t]he False Claims Act . . . is not limited to . . . facially false or fraudulent claims for payment'" and is, instead, "'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Carter v. Bridgepoint Educ., Inc.*, No. 10-cv-1401-JLS-WVG, 2014 WL 11906590, at *3 (S.D. Cal. Jan. 8, 2014) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (alteration in original).  Here, not only did Defendants submit false statements in the Fountainhead Loan application, they perpetuated that falsity by continuing to seek the Bank of America Loan after the Fountainhead Loan was approved and by signing closing documents to

11

1   receive the Fountainhead Loan after already receiving and spending funds from the Bank
2   of America Loan.

3        Defendants applied for their first PPP loan with Bank of America on April 8,
4   2020.  (SUF ¶ 8.)  Then, on May 7, 2020, while that loan application was still pending
5   and without withdrawing it, Defendants submitted an application for a second PPP loan
6   with Fountainhead, expressly certifying that "[d]uring the period beginning on February
7   15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive
8   another loan under the Paycheck Protection Program."  (SUF ¶¶ 13-16.)  As a result,
9   Defendants received PPP loans from both Bank of America and Fountainhead, and their
10  certification that they would only receive a single PPP loan in 2020 was an "express
11  falsehood."  *Escobar*, 579 U.S. at 187.

12       But even beyond the applications themselves, Defendants engaged in a
13  "fraudulent course of conduct" throughout the loan application process designed to
14  secure them two PPP loans despite certifying they would only receive one.  *Campie*, 862
15  F.3d at 899.  Indeed, on May 8, 2020, just one day after submitting the Fountainhead
16  Loan application, Schwartz received an email from Fountainhead's broker informing
17  him that he had received a "loan number" and that his "slice of the pie" had been
18  "reserved," which Schwartz understood to mean that "[his] loan had gone through."
19  (SUF ¶¶ 24-25.)  This was followed by another email on May 12, 2020, explicitly
20  confirming that the Fountainhead Loan "ha[d] been approved with the SBA."  (SUF ¶
21  27.)  Despite those notifications confirming that JMG would be receiving a PPP loan
22  from Fountainhead and Schwartz understanding that the Fountainhead Loan "had gone
23  through," Defendants kept their application with Bank of America pending and even
24  ***signed a promissory note*** with Bank of America to secure that PPP loan on May 15,
25  2020—a step without which Schwartz admitted he did not believe Bank of America
26  would have "given [him] a PPP loan."  (SUF ¶ 32.)

27       Defendants then doubled down by taking steps to ensure that they received a
28  second PPP loan from Fountainhead just one week after receiving the Bank of America

Loan.  As Schwartz admitted, Defendants received the funds from the Bank of America
Loan on May 15, 2020, and then worked with an agent of Bank of America to transfer
the funds a few days later before spending some of the PPP funds on May 21, 2020.
(SUF ¶¶ 33, 36-37.)  But on May 22, 2020, *the very next day*, Defendants signed and
submitted several closing documents, including a promissory note, to Fountainhead to
secure a second PPP loan despite previously certifying in their application that they
would not receive more than one PPP loan in 2020.  (SUF ¶¶ 39-45; *see also* SUF ¶ 40
(noting that Schwartz signed the "Borrower Certification and Agreement" on May 22,
2020 to "induce Fountainhead to provide [him] with a PPP loan").  And included in
those documents was a "U.S. Small Business Settlement Sheet," which must be
submitted to SBA "upon request, or, in the event of a loan default, with the Lender's
request for guaranty purchase," that included a *re-certification* of the information upon
which Defendants' original loan application was based.  (*See* SUF ¶¶ 44-45; *see also*
Declaration of Paden Gallagher ("Gallagher Decl."), Ex. I at 23 ("At the time of
completion of this form, the Lender and the Borrower certify that . . . [t]here has been no
unremedied adverse change in the Borrower's or Operating Company's financial
condition, organization, management, operations or assets since the date of the
application that would warrant withholding or not making this disbursement or any
further disbursement.").)  Put simply, even after Defendants certified they would only
receive one PPP loan in 2020 and had received one PPP loan, they then took affirmative
action to secure a second PPP loan for which they were not eligible.

Accordingly, there is no genuine dispute that Defendants submitted false
statements in their Fountainhead Loan application and furthered that falsity through their
course of conduct, and summary judgment is warranted on that element.

> 2.  <u>Defendants' Acted with Reckless Disregard of the Falsity of their
> Statements at Minimum.</u>

The FCA imposes liability on any person who submits a false claim to the
government with "actual knowledge," "deliberate ignorance," or "reckless disregard of

1    the truth." 31 U.S.C. § 3729(a)(1)(A)-(B), (b)(1)(A)(i)-(iii).  "[N]o proof of specific

2    intent to defraud" is "require[d]."  31 U.S.C. § 3729(b)(1)(B).  In defining "knowingly"

3    to include deliberate ignorance and reckless disregard, "Congress attempted 'to reach

4    what has become known as the "ostrich" type situation where an individual has "buried

5    his head in the sand" and failed to make simple inquiries which would alert him that

6    false claims are being submitted.'"  *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th

7    Cir. 2008) (quoting S. Rep. No. 99–345, at 21 (1986))*; see also United States ex rel.*

8    *Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (discussing the

9    same as to reckless disregard).  Congress further "adopted 'the concept that individuals

10   and contractors receiving public funds have some duty to make a limited inquiry so as to

11   be reasonably certain they are entitled to the money they seek.'"  *Bourseau*, 531 F.3d at

12   1168 (quoting S. Rep. No. 99-345, at 20 (1986)).  Indeed, circuit courts have "uniformly

13   described reckless disregard for purposes of the False Claims Act as akin to 'an

14   extension of gross negligence' or an 'extreme version of ordinary negligence.'"

15   *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting *United*

16   *States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *see also Krizek*, 111 F. 3d at 943

17   ("reckless disregard" is "a linear extension of gross negligence, or 'gross negligence-

18   plus'").

19           There can be no genuine dispute that Defendants acted at least with reckless

20   disregard when certifying that they would not receive two PPP loans in 2020.  When

21   Defendants submitted the Fountainhead Loan application on May 7, 2025, they were

22   aware that they had an application pending with Bank of America and did not withdraw

23   that application.  (SUF ¶¶ 8, 13, 26.)  Nor did they do so after Fountainhead's broker

24   informed them that they had a "loan number" on May 8, 2020, or when Fountainhead

25   explicitly confirmed that the Fountainhead Loan "ha[d] been approved with the SBA" on

26   May 12, 2020.  (SUF ¶¶ 24-28.)  Instead, after receiving that confirmation, Defendants

27   signed a promissory note with Bank of America to secure their first PPP loan on May 15,

28   2020, which Defendants then followed up with further actions to secure a second PPP

loan from Fountainhead just one week later.  (SUF ¶¶ 32, 39-46.)

And as to Defendants' knowledge of the prohibition on multiple PPP loans in 2020, Schwartz has already admitted that he was aware of the prohibition when he was applying for the PPP loans.  When questioned as to what he meant in an email he sent to Lori Grieder on June 8, 2022, about receiving a second PPP loan from Fountainhead, Schwartz admitted that he "***knew that . . . [he] was only supposed to get one PPP loan***," and Ms. Grieder confirmed that Schwartz informed Ms. Grieder that he was "going to put the money aside" from the Fountainhead Loan in case "[he] happen[ed] to have to pay" back the loan.  (SUF ¶¶ 51-53 (emphasis added).)  Furthermore, there is no doubt that Schwartz, at minimum, "buried his head in the sand" regarding the prohibition on multiple PPP loans, *Bourseau*, 531 F.3d at 1168, since he admitted that he prepared ***at least three*** PPP loan applications containing the certification regarding the prohibition, read each certification before doing so, and affirmatively made the certification in each application (*see* SUF ¶¶ 10-18, 22).  *See also United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law.") (quoting *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 63 (1984)).

There is no genuine dispute that Defendants acted, at minimum, with reckless disregard of the falsity of their statements, and summary judgment is warranted on scienter as well.

          3.    <u>Defendants' False Statements Were Material to the Decision to Issue the Fountainhead Loan.</u>

A statement is "material" under the FCA if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  The materiality standard is "demanding," but there is no "bright-line test for determining whether the FCA's materiality requirement has been met."  *United States ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1213 (9th Cir. 2019) (citing *Escobar*, 579 U.S. at 194).  Materiality "looks to the effect on the likely or actual

behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citation omitted). The Supreme Court identified at least four factors relevant to materiality in Escobar: (1) whether the violated requirement is a condition of payment; (2) whether the violations go to the "essence of the bargain"; (3) whether the violations are significant or trivial; and (4) what actions the government has taken when it has actual knowledge of the same or similar violations. *Id.* at 193–95 & n.5; *United States ex rel. Mei Ling v. Los Angeles*, 389 F. Supp. 3d 744, 753 (C.D. Cal. 2019).

Defendants' certifications that JMG would not receive two PPP loans in 2020 had the "natural tendency to influence" or was "capable of influencing" the SBA's decision to guarantee the Fountainhead Loan. 31 U.S.C. § 3729(b)(4). Under the rules governing the PPP, SBA and its lenders were not permitted to provide any borrower with two PPP loans in 2020. *See* 85 Fed. Reg. 20811, 20813-14 (April 15, 2020). And as indicated on the Fountainhead Loan application itself, to submit an application for a PPP loan in 2020, the applicant "must certify in good faith" that "[d]uring the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program." (Gallagher Decl., Ex. A at 2.) Without initialing next to that certification, Defendants' application would have been denied, and JMG would never have received the Fountainhead Loan. (SUF ¶¶ 4-5.)

Thus, Defendants' certification was clearly material, and summary judgment is warranted on that element.

### 4.    The Fountainhead Loan Application Constitutes a "Claim."

The fourth element under the FCA is the existence of a "claim." *See Campie*, 862 F.3d at 907 (referring to the fourth element as the "claim"). A "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States" or "is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States has or will provide or reimburse any portion of the money or property. 31 U.S.C.

16

§ 3729(b)(2).  Presentment of a claim against the government fisc can take multiple forms, including direct requests for payment to a federal agency or "submitting requests to private lenders for government-insured loans."  *Hendow*, 461 F.3d at 1177.  It is "irrelevant how the federal bureaucracy has apportioned the [false] statements among layers of paperwork"; "[a]ll that matters is whether the false statement or course of conduct causes the government to 'pay out money or to forfeit moneys due.'"  *Id.* (citations omitted).

An application for a PPP loan satisfies this definition because it is a request for money from a lender, and the CARES Act "temporarily permit[ted] SBA to guarantee 100 percent of 7(a) loans" from those lenders.  85 Fed. Reg. at 20811.  Further, Congress directed that SBA allow additional non-§ 7(a) lenders to participate in the PPP and mandated that SBA give all PPP lenders "delegated authority" to make and approve PPP loans without prior SBA review.  15 U.S.C. § 636(a)(36)(F)(ii)(I), (iii).  This allowed lenders to issue PPP loans at no risk because the United States would be required to either forgive or purchase any outstanding amounts of the loan.  In short, an application submitted to a lender acting with delegated authority from SBA to issue PPP loans is a request for a "government-insured loan," and it constitutes a "claim" under the FCA. *See Hendow*, 461 F.3d at 1177.

Here, SBA delegated authority to Fountainhead "to make and approve covered loans" under the PPP.  15 U.S.C. § 636(a)(36)(F)(ii)(I).  SBA only required Fountainhead to submit an "executed SBA Form 2484," an official request for a loan guaranty, "to issue PPP loans and receive a loan number for each originated PPP loan" through SBA's E-Tran system without waiting for a "separate SBA Authorization."  85 Fed. Reg. 23450, 23451 & n.1 (Apr. 28, 2020).  Thus, Defendants' application to Fountainhead constitutes a "claim" for a fully guaranteed PPP loan, which the United States was forced to purchase for $501,588 when Defendants did not repay the loan.

The Fountainhead Loan application constitutes a "claim" and because the application included materially false statements made with, at minimum, reckless

17

disregard of their falsity, the United States is entitled to summary judgment as to its FCA claims brought under 31 U.S.C. § 3729(a)(1)(A) and (B).

### C. Summary Judgment is Warranted on the United States' Reverse False Claim (Count III).

The "reverse false claim" provision of the FCA imposes liability on a defendant who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This provision "is designed to cover Government money or property that is knowingly retained by a person even though they have no right to it." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 676 (9th Cir. 2018) (quoting S. Rep. No. 111-10 at 13–14 (2009)). An "obligation" under the FCA is defined as an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). "Avoidance" of that obligation "includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing." *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015).

That Defendants owed an "obligation" which they "avoided" cannot be in dispute. The Fountainhead Loan constitutes an "overpayment" because Defendants were not eligible to receive the loan and, in fact, "do not assert any right to retain" it. (SUF ¶ 72.) Schwartz even acknowledged this when JMG received the duplicate PPP loan, stating to Lori Grieder that he was "going to put the money aside" from the Fountainhead Loan in case "[he] happen[ed] to have to pay" it back. (SUF ¶ 53.) Despite this, Defendants have made no payments on the loan. (SUF ¶ 54.) But beyond not repaying the loan, Defendants applied for forgiveness at least ***three times*** despite knowing that the Fountainhead Loan was not eligible for forgiveness. (SUF ¶¶ 59-65.) Fountainhead told Schwartz that the reason they were "rejecting the forgiveness" on the Fountainhead Loan

1   was because "they can only accept one PPP per year from any account" and that JMG

2   would have "5 years to pay it back." (SUF ¶ 62.) Rather than agree to repay the loan,

3   Schwartz contemplated applying for forgiveness *again*, resulting in Fountainhead

4   explaining—again—why forgiveness was impossible. (SUF ¶¶ 64-65; *see also*

5   Gallagher Decl., Ex. N (Fountainhead explaining that "SBA allows for 1-1st draw and 1-

6   2nd draw," while JMG had received "2-1st draw and 1-2nd draw").) Defendants still made

7   no payments on the loan, culminating in SBA purchasing the loan pursuant to the

8   guarantee, which Schwartz knew would result in JMG incurring an obligation to repay

9   the loan to the government. (SUF ¶¶ 66, 70; Gallagher Decl., Ex. B 77:21-24 (Schwartz

10  testifying that he "knew that if Fountainhead charged off th[e] loan, [he] would then

11  have an obligation to repay the funds to the government").)

12      Because Defendants retained an overpayment in the form of the Fountainhead

13  Loan and have not paid any of that overpayment back, the United States is entitled to

14  summary judgment on its reverse false claim.

15      **D.    Calculation of Damages Under the False Claims Act**

16      "Ordinarily the measure of the government's damages [under the FCA] would be

17  the amount that it paid out by reason of the false statements over and above what it

18  would have paid if the claims had been truthful." *United States v. Mackby*, 339 F.3d

19  1013, 1018 (9th Cir. 2003) (quoting *United States v. Woodbury*, 359 F.2d 370, 379 (9th

20  Cir. 1966)) (alteration in original). Similarly, damages for a reverse false claim "consist

21  of the difference between what the defendant should have paid the government and what

22  the defendant actually paid the government." *Bourseau*, 531 F.3d at 1172.

23      The Government's damages start with the reimbursement for the fraudulently

24  obtained loan. *See Mackby*, 339 F.3d at 1018 (damages are the total amount the

25  Government paid because of the falsity). The burden then shifts to Defendants to prove

26  any offsets, but there is no offset to a loan that would have never been made or forgiven.

27  Defendants obtained $501,588 for the Fountainhead Loan and caused SBA to pay

28  $15,407.46 in processing fees to Fountainhead, for total single damages of $516,995.46.

(SUF ¶¶ 46-47.)  Further, each false claim, record, and statement is subject to a mandatory civil penalty. 31 U.S.C. § 3729(a)(1).  FCA penalties "are adjusted upward for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990." *Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 123 n.1 (2003).  For penalties assessed after July 3, 2025, for violations that occur after November 2015, the statutory penalty is $14,308 to $28,619 per violation.  28 C.F.R. § 85.5.  In this case, there are multiple violations: the materially false loan application and the materially false forgiveness applications.

Accordingly, the United States is entitled to summary judgment for three times the amount of the Fountainhead Loan plus the processing fee associated with that loan, which amounts to $1,550,986.38.  In addition, the United States requests the Court to enter two civil penalties – one for the loan application and one representing the forgiveness applications – in an amount that it deems appropriate within the current statutory range.

## V.    CONCLUSION

The United States respectfully requests that the Court grant summary judgment on its claims.

1    Dated: November 17, 2025          Respectfully submitted,

2                                      BRETT A. SHUMATE
                                       Assistant Attorney General, Civil Division
3                                      BILAL A. ESSAYLI
                                       First Assistant United States Attorney
4                                      DAVID M. HARRIS
                                       Assistant United States Attorney
5                                      Chief, Civil Division
                                       HUNTER B. THOMSON
6                                      Acting Chief, Civil Fraud Section
                                       PAUL B. LA SCALA
7                                      Assistant United States Attorney
                                       JAMIE ANN YAVELBERG
8                                      COLIN M. HUNTLEY
                                       JARED S. WIESNER
9                                      PADEN GALLAGHER
                                       Attorneys, Civil Division

10

11                                      _/s/ Paden Gallagher_____
12                                      PADEN GALLAGHER
                                       Trial Attorney
13
                                       *Attorneys for the United States of America*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

1

**<u>Certificate of Compliance under L.R. 11-6.2</u>**

2      Counsel of record for the United States, certifies that this brief contains 6,989

3   words, which complies with the word limit of L.R. 11-6.1.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28